UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| IN THE MATTER OF ) | |
| ) | |
| THE EXTRADITION OF ) | Case No. 23-MC-23811 |
| ) | |
| RUTGER AAD JANSE ) | |

**MEMORANDUM OF EXTRADITION LAW AND REQUEST
FOR DETENTION PENDING EXTRADITION PROCEEDINGS**

The United States, in fulfilling its treaty obligations to the Kingdom of the Netherlands (the "Netherlands"),[1] respectfully requests that the fugitive in this case, Rutger Aad Janse ("Janse"), be held without bond pending the hearing on the certification of his extraditability pursuant to 18 U.S.C. §§ 3181 *et seq*. This memorandum summarizes the framework of extradition law in the United States and sets forth the reasons why Janse should be detained. In short, Janse should be detained because he cannot overcome the strong presumption against bail in international extradition cases. Specifically, he cannot meet his burden of showing that he poses no risk of flight and that special circumstances exist warranting his release.

**BACKGROUND**

The Netherlands seeks the provisional arrest, with a view towards extradition, of Janse so that he may be prosecuted for the following offenses: (1) fraud, in violation of Section 326 of the

---

[1] *See* Extradition Treaty Between the United States of America and the Kingdom of the Netherlands, U.S.-Neth., June 24, 1980, U.S.T. 1334 (the "1980 Treaty"), as amended by the Agreement Comprising the Instrument as contemplated by Article 3(2) of the Agreement on Extradition Between the United States of America and the European Union Signed at Washington on 25 June 2003, as to the application of the Extradition Treaty Between the United States of America and the Kingdom of the Netherlands signed at the Hague on 24 June 1980, U.S.-Neth., Sept. 29, 2004, S. TREATY DOC. NO. 109-14 (2006) (the "Agreement"), with Annex (collectively, the "Treaty"), and related exchange of notes. The Annex reflects the integrated text of the provisions of the 1980 Treaty and the Agreement.

Dutch Penal Code; (2) embezzlement, in violation of Sections 321 and 322 of the Dutch Penal Code; habitual money laundering, in violation of Section 420bis and 420ter of the Dutch Penal Code; and (4) providing investment services or conducting investment activities in the Netherlands without a permit from the Financial Markets Authority, in violation of Section 2:96 of the Financial Supervision Act in conjunction with Section 6 par. 1 sub 2 of the Economic Offence Act. On June 23, 2023, the Public Prosecutor at the National Office for Serious Fraud, Environmental Crime and Asset Confiscation in Amsterdam, the Netherlands, issued a warrant for Janse's arrest, which remains enforceable. According to information provided by the Netherlands, Janse's provisional arrest is sought based on the following facts:

In June and July 2022, the Authority for Financial Markets in the Netherlands ("AMF") and the Netherlands' Financial Intelligence Unit ("FIU") received reports from ABN AMRO Bank notifying them that it suspected that the bank accounts for two companies, Janse Capital and Bellflower BV, were being used to operating a fraud scheme.[2] After reviewing the suspicious transactions ABN AMRO Bank had identified, Dutch authorities identified twenty-three victims, who subsequently told authorities that Janse had defrauded them in an investment fraud scheme. The AMF confirmed that neither Janse nor the companies, Janse Capital and Bellflower BV, had the necessary investment permit to operate investment activities in the Netherlands. Based on the reports of ABN AMRO Bank and statements and evidence provided by the identified victims, Dutch authorities have established the following facts and timeline:

---

[2] ABN AMRO Bank initially flagged the bank accounts for fraud because each had numerous deposits from private individuals and companies who identified their deposits as being for investment purposes; however, ABN AMRO saw that the vast majority of outgoing transactions from the accounts were for private expenditures.

2

In May 2020, Janse began recruiting investment clients to his company, Janse Capital,[3] claiming that he would invest the clients' money in various companies making their initial public offering ("IPO"). Janse promised that the victims would receive high returns on their investments.

Janse entered into a written contract with each of his victims, which defined the terms of the victims' purported investments. The contracts outlined that Janse would purchase shares of companies on the victims' behalf. The shares would remain in Janse's name; however, the victims would be entitled to eighty percent of any proceeds that exceeded the amount of their initial investment. Twenty percent of the profits would remain with Janse Capital as a "success fee." The victims deposited money into Janse Capital's bank account or the bank account of Bellflower BV, a company operated by one of Janse's associates.[4]

Despite Janse's claim that he would invest the money he received from the victims, there is no evidence that he did so. The victims informed Dutch authorities that they did not receive the promised profits from their investments, and Janse never provided them with evidence that he had actually invested the money he had received. Instead, Janse merely assured the victims that he had made the agreed upon investments, but said he was unable to provide them with payment because Janse Capital's bank account was frozen due to a "general audit." He promised that once the audit was finished, he would pay the victims the profits their investments had earned.

---

[3] Public records confirm that Janse is the sole owner and director of Janse Capital which operates as "a business consultancy . . . providing information in the field of business economics and ICT services."

[4] Dutch authorities arrested the sole owner and operator of Bellflower BV, S.C. de Koning, as a co-conspirator in the fraud scheme. According to de Koning, after ABN AMRO Bank froze Janse Capital's bank account for suspected fraud, Janse asked de Koning to use Bellflower BV's bank account to receive victims' investments, which Janse subsequently transferred to one of his other bank accounts. Bank records for Bellflower BV confirmed that most of the money deposited into this account was subsequently transferred to Janse.

A review of Janse Capital's and Bellflower BV's bank accounts showed that Janse did not invest the money he received from victims. The accounts received numerous transactions from victims made to the Janse Capital and Bellflower BV bank accounts, amounting to approximately EUR 4,041,839 (approximately USD 4,405,045).[5] Based on the outgoing transactions from these accounts, there is no evidence that Janse used this money to invest in companies making their IPO. Instead, the transaction history showed that Janse used the money he received from victims to make lavish, private purchases and to support his family members.

In response to a request from the Netherlands, the United States, in accordance with its obligations under the Treaty and pursuant to 18 U.S.C. §§ 3181, *et seq.*, filed a complaint in this District seeking a warrant for Janse's provisional arrest with a view toward extradition. This Court issued an arrest warrant, and Janse was arrested on this extradition matter on October 5, 2023. Janse is currently in the custody of the U.S. Marshals Service.

## ARGUMENT

I.   **LEGAL FRAMEWORK OF EXTRADITION PROCEEDINGS**

   A.   **The limited role of the Court in extradition proceedings**

The extradition process is *sui generis*. Extradition is primarily an executive function with a specially defined role for the Court, which is authorized by statute to hold a hearing at which it determines whether to certify to the Secretary of State that the evidence provided by the requesting country is "sufficient to sustain the charge." 18 U.S.C. § 3184; *see Kastnerova v. United States*,

---

[5] Dutch authorities have confirmed that approximately EUR 1.7 million (approximately USD 1,853,017) deposited in the Janse Capital account belongs to the 23 identified victims. Dutch authorities have identified an additional EUR 2.3 million (approximately USD 2,507,023) from transactions that appear to have been made by other, yet unidentified victims.

365 F.3d 980, 984 n.5 & 986 (11th Cir. 2004). The Secretary of State, and not the Court, then decides whether the fugitive should be surrendered to the requesting country. 18 U.S.C. §§ 3184, 3186; *Martin v. Warden, Atlanta Penitentiary*, 993 F.2d 824, 828-29 (11th Cir. 1993). "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch." *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997).

At the extradition hearing, the Court's role is limited to considering the requesting country's evidence and determining whether the legal requirements for certification of extraditability—as defined in the applicable extradition treaty, statutes, and case law—have been established. *See Martin*, 993 F.2d at 828-29. If the Court finds that the requirements for certification have been met, it must provide the certification to the Secretary of State, together with a copy of any testimony taken before the Court, and must commit the fugitive to the custody of the U.S. Marshal to await the Secretary's final determination regarding surrender. 18 U.S.C. § 3184 (following certification, the extradition judge "shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made"); *see Martin*, 993 F.2d at 828.

### B. The requirements for certification

The Court must certify to the Secretary of State that a fugitive is extraditable when the following requirements have been met: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the Court has jurisdiction over the fugitive; (3) the applicable extradition treaty is in full force and effect; (4) the crimes for which surrender is requested are

covered by the treaty; and (5) there is sufficient evidence to support a finding of probable cause as to each charge. *See*, *e.g.*, *In re Extradition of Martinelli Berrocal*, No. 17-cv-22197, 2017 WL 3776953, at *10 (S.D. Fla. Aug. 31, 2017); *In re Extradition of Shaw*, No. 14-cv-81475, 2015 WL 3442022, at *5 (S.D. Fla. May 28, 2015). The following sections briefly discuss each of those requirements.

1. Authority over the proceedings

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184. As such, the judicial officer conducting the extradition hearing prescribed by Section 3184 does not exercise "any part of the judicial power of the United States," but rather acts in a "non-institutional capacity by virtue of a special authority," *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993) (internal quotation marks and citations omitted). Both magistrate judges and district judges may render a certification under Section 3184. *See Austin v. Healey*, 5 F.3d 598, 601-02 (2d Cir. 1993). This District's local rules expressly authorize magistrate judges to "[c]onduct extradition proceedings, in accordance with 18 U.S.C. § 3184." *See* Rule 1(a)(3), Magistrate Judge Rules for the U.S. District Court for the Southern District of Florida.

2. Jurisdiction over the fugitive

The Court has jurisdiction over a fugitive, such as Janse, who is found within its jurisdictional boundaries. 18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction . . . issue his warrant for the apprehension of the person so charged.").

3. <u>Treaty in full force and effect</u>

Section 3184 provides for extradition in specifically defined situations, including whenever a treaty or convention for extradition is in force between the United States and the requesting state. *See id.*; *see also Arias v. Warden*, 928 F.3d 1281, 1285 (11th Cir. July 8, 2019); *Kastnerova*, 365 F.3d at 987. The government will satisfy this requirement at the extradition hearing by offering into evidence a declaration from an attorney in the Office of the Legal Adviser for the U.S. Department of State, attesting that there is a treaty in full force and effect between the United States and the Netherlands. The Court must defer to the Department of State's determination in that regard. *E.g.*, *Arias*, 928 F.3d at 1288 (where "[Department of State] declaration set forth the United States Executive Branch's position—that the Treaty remains in full force," courts "have no answer but this: the Treaty remains in effect").

4. <u>Crimes covered by the treaty</u>

Extradition treaties create an obligation for the United States to surrender fugitives under the circumstances defined in the treaty. Article 1 of the applicable treaty in this case provides for the return of fugitives charged with, or convicted of, an "extraditable offense" as that term is defined under the Treaty.

Article 2 of the Treaty defines extraditable offenses as (a) offenses "referred to in the Appendix to this Treaty which are punishable under the laws of both Contracting Parties"; and (b) offenses, "whether listed in the Appendix to this Treaty or not, provided they are punishable under the Federal laws of the United States of America and the laws of the Kingdom of the Netherlands." Treaty Art. 2(1). The Appendix to the Treaty expressly provided for extradition for offenses including fraud; receiving, possessing or transporting anything of value knowing it to have been

7

unlawfully obtained; embezzlement; and offenses relating to securities and commodities. Further, the Treaty provides that extradition "shall be granted in respect of an extraditable offense . . . [f]or prosecution, if the offense is punishable under the laws of both Contracting Parties by deprivation of liberty for a period exceeding one year." *Id.* Art. 2(2)(a).

The requesting country need not establish that its crimes are identical to ours. "The law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions. *Collins v. Loisel*, 259 U.S. 309, 212 (1922).

In fulfilling its function under Section 3184, the Court should liberally construe liberally the applicable extradition treaty in order to effectuate its purpose, namely, the surrender of fugitives to the requesting country. *Factor v. Laubenheimer*, 290 U.S. 276, 301 (1933); *see also, e.g.*, *Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016) (en banc) ("default rule" is that any ambiguity in extradition treaty must be construed in favor of "facilitat[ing] extradition"). Accordingly, because extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers," *Grin v. Shine*, 187 U.S. 181, 184 (1902), the Court should "approach challenges to extradition with a view towards finding the offenses within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981).

        5.      <u>Probable cause that the fugitive has committed the offenses</u>

To certify the evidence to the Secretary of State, the Court must conclude there is probable cause to believe that the crimes charged by the Netherlands were committed by the person before the Court. *E.g.*, *Castro Bobadilla v. Reno*, 826 F. Supp. 1428, 1432 (S.D. Fla. 1993). The evidence

8

is sufficient, and probable cause is established, if it would cause a "prudent man" to "believ[e] that the (suspect) had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (internal quotation marks and citation omitted). The extradition judge's probable cause determination is "not a finding of fact in the sense that the court has weighed the evidence and resolved disputed factual issues," but instead "serve[s] only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based." *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986) (quotations omitted); *see Martinelli Berrocal*, 2017 WL 3776953, at *21 (same).

  **C.**  **An extradition hearing follows unique procedures**

As detailed above, the purpose of an extradition hearing is to decide the sufficiency of each charge for which extradition is requested under the applicable extradition treaty; it is not to determine the guilt or innocence of the fugitive—that determination is reserved for the foreign court. *Collins*, 259 U.S. at 316; *Neely v. Henkel*, 180 U.S. 109, 123 (1901). Accordingly, an extradition hearing is not a criminal proceeding. *See, e.g.*, *Martin*, 993 F.2d at 828. Rather, it is "an administrative proceeding arising under international law for certification and approval of the State Department's decision to extradite this person at the request of a foreign government," *see In re Extradition of Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1284 (S.D. Fla. 2017), and it is governed by "the general extradition law of the United States and the provisions of the Treaty," *Emami v. U.S. Dist. Ct.*, 834 F.2d 1444, 1450-51 (9th Cir. 1987).

Accordingly, the Federal Rules of Evidence do not apply to extradition proceedings. *See e.g.*, *Afanasjev v. Hurlburt*, 418 F.3d 1159, 1164-65 (11th Cir. 2005); *see also* Fed. R. Evid. 1101(d)(3) ("These rules—except for those on privilege—do not apply to . . . miscellaneous

9

proceedings such as extradition or rendition."). Indeed, hearsay evidence is admissible at an extradition hearing, and, moreover, "[a] certification of extradition may be and usually is based entirely on the authenticated documentary evidence and information provided by the requesting government." *Shaw*, 2015 WL 3442022, at *4; *see also, e.g.*, *Afanasjev*, 418 F.3d at 1165 (unsworn statements may be sufficient to justify extradition) (citing *Collins*, 259 U.S. at 317). Nothing more is required, and typically nothing more is provided. *See, e.g.*, *In re Extradition of Nunez-Garrido*, 829 F. Supp. 2d 1277, 1287 (S.D. Fla. 2011) ("It is exceedingly rare for the Government to submit anything other than documents in support of an extradition request."); *Bovio v. United States*, 989 F.2d 255, 259 (7th Cir. 1993) (police detective's statement summarizing results of investigation established probable cause); *Zanazanian v. United States*, 729 F.2d 624, 627-28 (9th Cir. 1984) (police report describing witness statements is competent evidence). Extradition treaties do not require, or even anticipate, the testimony of live witnesses at the hearing. Indeed, requiring the "demanding government to send its citizens to another country to institute legal proceedings, would defeat the whole object of the treaty." *Bingham v. Bradley*, 241 U.S. 511, 517 (1916).

The Federal Rules of Criminal Procedure also do not apply to extradition proceedings. Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by these rules include . . . the extradition and rendition of a fugitive."); *Afanasjev*, 418 F.3d at 1164-65. A fugitive has no right to discovery. *See, e.g.*, *Prasoprat v. Benov*, 421 F.3d 1009, 1014 (9th Cir. 2005). Furthermore, many constitutional protections applicable in criminal cases do not apply. For example, a fugitive has no right to cross-examine witnesses who might testify at the hearing, *see, e.g.*, *Nunez-Garrido*, 829 F. Supp. 2d at 1282-83 (collecting cases); there is no Sixth Amendment right to a speedy trial, *see, e.g.*, *Martin* 993 F.2d at 829; the Fifth Amendment guarantee against double jeopardy does not

apply to successive extradition proceedings, *see, e.g.*, *In re Extradition of Batchedler*, 494 F. Supp. 2d 1302, 1309 (N.D. Fla. 2007) ("Double jeopardy has no role at all in an extradition proceeding.") (citing *Collins*, 262 U.S. at 429); the exclusionary rule is not applicable, *see, e.g.*, *Simmons v. Braun*, 627 F.2d 635, 636-37 (2d Cir. 1980); and a fugitive does not have the right to confront his accusers, *see, e.g.*, *Bingham*, 241 U.S. at 517.

Relatedly, a fugitive's right to present evidence is severely constrained. *See, e.g*, *Nunez-Garrido*, 829 F. Supp. 2d at 1281. A fugitive may not introduce evidence that contradicts the evidence submitted on behalf of the requesting country, but rather may only introduce evidence explaining the submitted evidence. *See Charlton v. Kelly*, 229 U.S. 447, 461-62 (1913). A contrary rule "might compel the demanding government to produce all its evidence . . . both direct and rebutting, in order to meet the defense thus gathered from every quarter." *Collins*, 259 U.S. at 316 (quoting *In re Extradition of Wadge*, 15 F. 864, 866 (S.D.N.Y. 1883)); *Shaw*, 2015 WL 3442022, at *8 ("Defendant has consistently attempted to contradict the case brought against him in [the requesting country]. . . . This the Defendant cannot do."). "The extent to which a fugitive may offer explanatory proof is largely within the discretion of the court." *United States v. Fernandez-Morris*, 99 F. Supp. 2d 1358, 1366 (S.D. Fla. 1999).

In addition, courts routinely reject technical and affirmative defenses in extradition proceedings. *See, e.g.*, *Bingham*, 241 U.S. at 517 (rejecting objections to extradition that "savor of technicality"); *Hooker v. Klein*, 573 F.2d 1360, 1368 (9th Cir. 1978) (noting that extradition court "properly may exclude evidence of alibi, or facts contradicting the government's proof, or of a defense such as insanity"); *Martinelli Berrocal*, 2017 WL 3776953, at *27 (citing cases); *Fernandez-Morris*, 99 F. Supp. 2d at 1373 n.5. These issues, which require factual or credibility

determinations, are reserved for the courts in the requesting country to resolve after the fugitive is extradited.

### D. Rule of non-inquiry: All matters other than certification are reserved for the Secretary of State

All matters raised by the fugitive as a defense to extradition, other than those related to the requirements for certification, are to be considered by the Secretary of State, not by the Court. *See* 18 U.S.C. §§ 3184, 3186. For example, the Secretary of State should address a fugitive's contentions that an extradition request is politically motivated, that the requesting state's justice system is unfair, or that extradition should be denied on humanitarian grounds. *Arias*, 928 F.3d at 1295 ("We have neither the power nor competence to consider a foreign fugitive's concern about the fairness of his country's criminal justice system, let alone halt his extradition on that basis—that kind of consideration is properly addressed to the Executive Branch."); *Martin*, 993 F.2d at 830 n.10 ("We [have] explicitly held that judicial intervention in extradition proceedings based on humanitarian considerations is inappropriate. Rather, humanitarian considerations are matters properly reviewed by the Department of State.") (citation omitted); *Koskotas v. Roche*, 931 F.2d 169, 173-74 (1st Cir. 1991) (motives of requesting state is a matter for consideration by the executive branch); *Quinn*, 783 F.2d at 789-90 (noting that "the Secretary of State has sole discretion to determine whether a request for extradition should be denied because it is a subterfuge made for the purpose of punishing the accused for a political crime, or to refuse extradition on humanitarian grounds because of the procedures or treatment that await a surrendered fugitive") (citation omitted). This practice is consistent with the long-held understanding that the surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State." *See In re Kaine*, 55 U.S. 103, 110 (1852).

## II.     JANSE SHOULD BE DETAINED

Just as extradition hearings follow unique procedures, the determination of whether to release a fugitive on bail is also *sui generis*. The federal statutes governing extradition in the United States, 18 U.S.C. §§ 3181 *et seq.*, do not provide for bail. Further, the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, does not apply because, as explained above, an extradition proceeding is not a criminal case.[6] *See In re Extradition of Shaw*, No. 14-MC-81475-WM, 2015 WL 521183, at *5 (S.D. Fla. Feb. 6, 2015). Rather, case law provides that bail should be granted in an extradition proceeding "only in the most pressing circumstances, and when the requirements of justice are absolutely peremptory." *United States v. Leitner*, 784 F.2d 159, 160 (2d Cir. 1986) (quoting *In re Mitchell*, 171 F. 289, 289 (S.D.N.Y. 1909) (Hand, J.)).

### A.     Applicable law

#### 1.     A strong presumption against bail governs in an international extradition proceeding

Unlike in domestic criminal cases, "there is a presumption against bond." *Martin*, 993 F.2d at 827; *see also Martinelli Berrocal*, 263 F. Supp. 3d at 1294 ("[A]ny release of a detainee awaiting extradition is largely antithetical to the entire process."). The Supreme Court established this presumption against bail in *Wright v. Henkel*, explaining that when a foreign government makes a proper request pursuant to a valid extradition treaty, the United States is obligated to deliver the person sought after he or she is apprehended:

> The demanding government, when it has done all that the treaty and the law require it to do, is entitled to the delivery of the accused on the issue of the proper warrant, and the other government is under obligation to make the surrender; an obligation

---

[6] The Bail Reform Act applies only to "offenses" in violation of U.S. law that are triable in U.S. courts. *See* 18 U.S.C. §§ 3141(a), 3142, 3156(a)(2). Here, Janse is not charged with an "offense" within the meaning of 18 U.S.C. § 3156, but rather with offenses in violation of Dutch law.

> which it might be impossible to fulfill if release on bail were permitted. The enforcement of the bond, if forfeited, would hardly meet the international demand; and the regaining of the custody of the accused obviously would be surrounded with serious embarrassment.

190 U.S. at 62.

The prudential reasons for this presumption against bail in international extradition cases are clear and compelling. When, as here, a requesting country meets the conditions of the Treaty, the United States has an "overriding interest in complying with its treaty obligations" to deliver the fugitive. *In re Extradition of Garcia*, 615 F. Supp. 2d 162, 166 (S.D.N.Y. 2009); *see also Wright*, 190 U.S. at 62. It is important that the United States be regarded in the international community as a country that honors its agreements in order to be in a position to demand that other nations meet their reciprocal obligations to the United States. Such reciprocity would be defeated if a fugitive flees after being released on bond. *See Martinelli Berrocal*, 263 F. Supp. 3d at 1306 ("[O]ur Executive Branch has a vested interest in enforcing our own treaty obligations for fear that other treaty partners will refrain from doing so in the future. And a difficult but necessary measure in carrying out that responsibility is to secure a wanted individual and surrender him or her to the foreign jurisdiction.").

> 2. <u>Fugitives must be detained unless they establish "special circumstances" and also demonstrate that they are neither a flight risk nor a danger to the community</u>

In light of the strong presumption against bail established in *Wright*, fugitives may not be released on bail unless they demonstrate that (1) they are neither a flight risk nor a danger to the community, *and* (2) "special circumstances" warrant their release. *See, e.g.*, *In re Extradition of Kirby*, 106 F.3d 855, 862-63 (9th Cir. 1996); *Leitner*, 784 F.2d at 160-61; *Shaw*, 2015 WL 521183, at *5; *Martinelli Berrocal*, 263 F. Supp. 3d at 1292 (for over a hundred years, the "special

14

circumstances" test has been applied by circuit and district courts for bail determinations in extradition cases).[7] "This 'special circumstances' standard is much stricter than the 'reasonable assurance' of appearance standard made applicable to domestic criminal proceedings by the Bail Reform Act." *In re Extradition of Kin-Hong*, 913 F. Supp. 50, 53 (D. Mass. 1996).

In evaluating a fugitive's risk of flight in the extradition context, courts have considered, among other things, the fugitive's financial means, ties with foreign countries, age, and incentive to flee based on the severity of the offense. *See, e.g.*, *Martinelli Berrocal*, 263 F. Supp. 3d at 1304-06; *In re Extradition of Beresford-Redman*, 753 F. Supp. 2d 1078, 1091 (C.D. Cal. 2010) (finding that a "well-educated and sophisticated" fugitive facing serious charges in foreign country had both the "incentive and ability to flee" and therefore presented a flight risk); *In re Extradition of Patel*, 08-MJ-430-HUBEL, 2008 WL 941628, at *2 (D. Or. Apr. 4, 2008) (considering the fact that a fugitive, a physician, had "more than sufficient assets available with which to flee"). Crucially, the special circumstances inquiry is separate from, and additional to, considerations of danger to the community or risk of flight. *See, e.g.*, *Shaw*, 2015 WL 521183, at *6; *In re Extradition of Perez-Cueva*, No. 16-0233M, 2016 WL 884877, at *2 (C.D. Cal. Mar. 7, 2016) (special circumstances must exist in addition to absence of risk of flight). "Even a low risk of flight" is not a circumstance sufficiently "unique" to constitute a special circumstance. *Leitner*, 784 F.2d at 161;

---

[7] "The case law . . . reflects an inconsistency among courts in their analysis of flight risk in relation to the 'special circumstances' inquiry. Most courts treat flight risk as a separate, independent factor from the special circumstances analysis. The courts that examine risk of flight and special circumstances separately thus require the potential extraditee to establish the following two factors before [they] can grant bail in a foreign extradition case: (1) 'special circumstances' exist in their particular case; and (2) they are not a flight risk or a danger to the community. The majority of cases that have examined this question, especially those in our Circuit, have concluded that the risk of flight analysis is a separate inquiry." *Martinelli Berrocal*, 263 F. Supp. 3d at 1303 (citations and quotation marks omitted).

*see also Martin*, 993 F.2d at 827 (stating that "a defendant in an extradition case will be released on bail only if he can prove 'special circumstances'" and declining to consider the fugitive's argument that the district court erred in determining that he was a flight risk); *Salerno v. United States*, 878 F.2d 317, 317-18 (9th Cir. 1989) (lack of flight risk "is not a criteria for release in an extradition case"). Accordingly, a fugitive who poses a danger to the community or a risk of flight should be denied bail, even in the face of special circumstances. *In re Extradition of Siegmund*, 887 F. Supp. 1383, 1384 (D. Nev. 1995).

"Special circumstances must be extraordinary and not factors applicable to all defendants facing extradition." *In re Extradition of Mainero*, 950 F. Supp. 290, 294 (S.D. Cal. 1996) (citing *In re Extradition of Smyth*, 976 F.2d 1535, 1535-36 (9th Cir. 1992)). Courts have considered and rejected a lengthy list of would-be special circumstances, including:

- The complexity of the pending litigation, *see, e.g.*, *United States v. Kin-Hong*, 83 F.3d 523, 525 (1st Cir. 1996);

- The fugitive's need to consult with an attorney and/or participate in pending litigation, *see, e.g.*, *Smyth*, 976 F.2d at 1535-36;

- The fugitive's character, background, and/or ties to the community, *see, e.g.*, *In re Extradition of Noeller*, No. 17-CR-664, 2017 WL 6462358, at *5 (N.D. Ill. Dec. 19, 2017); *Beresford-Redman*, 753 F. Supp. 2d at 1089; *In re Extradition of Sidali*, 868 F. Supp. 656, 658 (D.N.J. 1994);

- The fact that the fugitive may have been living openly, *see, e.g.*, *Leitner*, 784 F.2d at 160-61; *In re Extradition of Pelletier*, No. 09-mc-22416, 2009 WL 3837660, at *1, 3-4 (S.D. Fla. Nov. 16, 2009);

- Discomfort, special dietary needs, or medical concerns that can be attended to while incarcerated, *see, e.g.*, *Noeller*, 2017 WL 6462358, at *8-9; *Martinelli Berrocal*, 263 F. Supp. 3d at 1301-02; *In re Extradition of Kyung Joon Kim*, 04-cv-3886, 2004 WL 5782517, at *5 (C.D. Cal. July 1, 2004);

- U.S. citizenship or the pendency of naturalization or other immigration proceedings, *see, e.g.*, *Matter of Extradition of Carr*, 20-CR-370, 2020 WL 4816052, at *6 (N.D. Ill. Aug. 18, 2020); *Matter of Extradition of Antonowicz*, 244 F. Supp. 3d 1066, 1072 (C.D. Cal. 2017); *Matter of Knotek*, 2016 WL 4726537, at *7 (C.D. Cal. Sept. 8, 2016); *Shaw*, 2015 WL 521183, at *8; *In re Extradition of Orozco*, 268 F. Supp. 2d 1115, 1117 (D. Ariz. 2003);

- The fugitive's professional status, *see, e.g.*, *Pelletier*, 2009 WL 3837660, at *3-4 (allegedly well-respected businessman); *In re Extradition of Heilbronn*, 773 F. Supp. 1576, 1581-82 (W.D. Mich. 1991) (highly-trained doctor);

- The availability of electronic monitoring, *see, e.g.*, *In re Extradition of Rovelli*, 977 F. Supp. 566, 569 (D. Conn. 1997);

- Ordinary delay or delay occasioned by the fugitive in the course of extradition proceedings, *see, e.g.*, *Salerno*, 878 F.2d at 318; *Martinelli Berrocal*, 263 F. Supp. 3d at 1297-98; *Antonowicz*, 244 F. Supp. 3d at 1070; and

- The availability of bail for the same offense in the requesting country, *see, e.g.*, *Martinelli Berrocal*, 263 F. Supp. 3d at 1298-99; *Antonowicz*, 244 F. Supp. 3d at 1070; *Kyung Joon Kim*, 2004 WL 5782517, at *2; *Siegmund*, 887 F. Supp. at 1386-87.

While in certain exceptional cases some of the above may have been deemed a special circumstance, courts generally determine special circumstances to exist based on a confluence of factors, as opposed to any single consideration. Such findings are highly case-specific and within the discretion of the Court, mindful of the strong presumption against bail and future reciprocity of other countries at stake.

  **B.**  **Analysis**

The Court should detain Janse without bond because he poses a flight risk. Janse's risk of flight is especially apparent because of his history of evading justice, having fled after a Dutch bank froze Janse's accounts for suspected fraudulent activity and it requested an explanation from him for the flagged, suspicious transactions. Further, now that Janse is aware the Netherlands

17

seeks his extradition, he has a strong incentive to flee further, whether to a third country or to an underground location within the United States. *See*, *e.g.*, *In re Extradition of Adame*, 2013 WL 1222115, at *3 (S.D. Tex. Mar. 25, 2013) (the fugitive "has virtually no incentive to appear at his extradition hearing, where, due to the Government's low burden of proof, there is a significant risk that he will be formally extradited to Mexico"); *see also*, *e.g.*, *Shaw*, 2015 WL 521183, at *9 ("[T]he Defendant is facing serious criminal sanctions in Thailand, which fact provides him with a strong incentive to flee."); *cf. United States v. Botero*, 604 F. Supp. 1028, 1035 (S.D. Fla. 1985) ("In the context of determining whether a defendant poses a substantial risk of flight, this Court does not find any meaningful distinction between a person who left the country when he learned of pending charges and one who already outside the country refuses to return to face these charges. The intent is the same—the avoidance of prosecution.") (citing *Jhirad v. Ferrandina*, 536 F.2d 478, 483 (2d Cir. 1976)). The flight risk that Janse poses, is, alone, fatal to any bail application.

Accordingly, the Court should find that Janse is a flight risk and therefore not eligible for bail in this extradition proceeding. However, even if the Court were satisfied that Janse is not a flight risk, the government is unaware of any "special circumstances" that would justify bail in this case. *Cf. In re Drumm*, 150 F. Supp. 3d 92, 97-100 (D. Mass. 2015) (denying bail because of a failure to show a special circumstance, even though the court found that defendant posed no danger to the community and defendant's risk of flight could be adequately mitigated).

Should, however, the Court be inclined to grant bail in this case, the government respectfully requests that the Court submit special written findings as to those specific matters that are found to constitute "special circumstances." Moreover, in order to protect the ability of the United States to meet its treaty obligations to the Government of the Netherlands, the government

also requests that the Court notify the parties within a reasonable amount of time in advance of any contemplated release order.

## **CONCLUSION**

For the foregoing reasons, the United States requests that Janse be detained pending resolution of this extradition proceeding.

Dated: October 5, 2023 　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　　　MARKENZY LAPOINTE
　　　　　　　　　　　　　　　　　　　　　　　United States Attorney,

　　　　　　　　　　　By:

　　　　　　　　　　　　　　　　　　　　　　　s/ *Robert F. Moore*
　　　　　　　　　　　　　　　　　　　　　　　Robert F. Moore
　　　　　　　　　　　　　　　　　　　　　　　Assistant United States Attorney